IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION, | | |
| Plaintiff, | | No. 4:14-cv-000345 |
| vs. | | |
| NICK GERHART, in his official capacity as INSURANCE COMISSIONER OF THE STATE OF IOWA, and THOMAS J. MILLER, in his official capacity as ATTORNEY GENERAL OF THE STATE OF IOWA, | | **ORDER** |
| Defendants. | | |

This matter comes before the Court pursuant to Defendants' October 23, 2014, motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff responded to this motion on November 24, 2014. Defendants filed their reply brief on December 4, 2014, and the Court held oral argument on January 13, 2015. In their motion to dismiss, Defendants first claim that Plaintiff lacks Article III standing and that Plaintiff's claims should therefore be dismissed pursuant to Federal Rule 12(b)(1). Defendants also argue that several of Plaintiff's allegations fail to state a claim under rule 12(b)(6). Plaintiff responds that Plaintiff has sufficiently established Article III standing and articulated claims sufficient to withstand the instant motion to dismiss.

Plaintiff's claims challenge the constitutionality of Iowa House File 2297 ("HF 2297"), a law regulating pharmacy benefits managers. Plaintiff claims that HF 2297 is preempted by the Employee Retirement Income Security Act ("ERISA"), that HF 2297 violates the Takings Clauses of both the United States and the Iowa Constitution, and that HF 2297 violates the United States Constitution's Dormant Commerce Clause. Plaintiff seeks a declaratory judgment that HF 2297 is unconstitutional and asks the court to enjoin Defendants from enforcing HF 2297.

## I. BACKGROUND

Many Iowa residents receive prescription drug benefits through health plans. Health plans providing prescription drug benefits include ERISA-governed employee health benefit plans,

health plans offered by non-profit hospitals, those sponsored by unions, and more. Health plans often provide plan participants with prescription drugs through contracts with pharmacy benefits managers ("PBMs"). PBMs are third-party administrators who administer the plans' prescription drug benefits. In so doing, PBM's maintain retail pharmacy networks. PBMs negotiate discounts from network pharmacies for prescription drugs and pharmacy services. PBMs' contracts with these pharmacies include agreements about the maximum amount that the PBM will reimburse a pharmacy for distributed name-brand and generic drugs. For some drugs, PBMs use what is called maximum allowable cost ("MAC") methodology to determine the amount they will reimburse pharmacies. MAC prices specify the amount a PBM will reimburse a pharmacy that has dispensed a drug to a consumer for a generic drug of a particular strength and dosage that is available from multiple manufacturers and sold at different prices. Each PBM develops and maintains its own MAC pricing lists, using its own methodology. Pharmacies complain that MAC reimbursements can, at times, be so low that pharmacies are forced to either sell drugs at a loss or refuse to dispense certain drugs.

Plaintiff Pharmaceutical Care Management Association ("PCMA") is the national trade association representing PBMs. PCMA represents eleven PBMs. PCMA's specific purposes include, but are not limited to, "advanc[ing] the common interests of these companies engaged in the business of pharmaceutical care management" and "lead[ing], educat[ing] and advocat[ing] on behalf of those companies engaged in pharmaceutical care management." Plaintiff's Resistance to Defendants' Motion to Dismiss ("Resistance") at Exhibit 1.

On July 1, 2014, HF 2297 went into effect in Iowa. HF 2297 regulates PBMs by overseeing PBMs' MAC methodology. HF 2297 requires PBMs to submit certain information to the Iowa Insurance Commissioner upon the Commissioner's request, and requires PBMs to utilize nationally recognized data when setting maximum reimbursement amounts for certain prescription drugs. HF 2297 also requires PBMs to disclose how they calculate their reimbursement amounts in any contracts with Iowa pharmacies and give contracting pharmacies a chance to contest the reimbursement amount. Defendants challenge both Plaintiff's standing to challenge HF 2297 and the sufficiency of Plaintiff's pleadings.

## II. STANDING ANALYSIS

### A. Legal Standard for Motion to Dismiss for Lack of Article III Standing Under 12(b)(1)

Defendants challenge Plaintiff's Article III standing to bring this claim, and therefore the Court's subject matter jurisdiction to hear the claim, under Federal Rule of Civil Procedure 12(b)(1). "Article III standing is a threshold question in every federal court case." *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003). The party invoking the Court's jurisdiction bears the burden of establishing standing. *Id.*; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiff's "response, by affidavit or otherwise, must set forth specific facts showing the court has jurisdiction." *W. Neb. Council v. Wyoming Fuel Co.*, 641 F. Supp. 128, 132 (D. Neb. 1986) ("[T]he trial court may consider extrinsic evidence without converting the proceeding to a summary judgment."). In ruling on a motion to dismiss for lack of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Additionally, "it is within the trial court's power to allow or require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Id.* at 501–02. However, "the standing inquiry is not . . . an assessment of the merits of a plaintiff's claim." *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012).

A party can mount either a "facial" or a "factual" attack on a plaintiff's Article III standing. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). "In [a facial attack], the court restricts itself to the face of the pleadings, *Mortensen* [*v. First Fed. Savings and Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977)], and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* Generally, "a complaint should not be dismissed [on a facial attack] 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

In contrast, "a factual challenge lies where the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (internal quotation marks omitted) (citations omitted). "In a factual attack, the court considers matters outside the pleadings . . . and the nonmoving party does not have the benefit of 12(b)(6) safeguards." *Osborn*, 918 F.2d at 729 n.6

(internal citations omitted); *see also Apex Digital Inc.*, 572 F.3d at 444 (citation omitted) ("[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."). When a party brings a factual attack on a plaintiff's standing, the burden is on the plaintiff to demonstrate standing, and the court will not assume the pleadings are true with respect to Plaintiff's standing. *Osborn*, 918 F.2d at 729 n.6.

## B. Article III Standing Requirements

A plaintiff has Article III standing when he establishes three elements. First, a plaintiff "must have suffered an 'injury in fact.'" *Lujan*, 504 U.S. at 559. Second, "there must be a causal connection between the injury and the" Defendants' conduct. *Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted) (citations omitted). These standing requirements apply to traditional claims by an individual plaintiff.

At times, an organization or association may attempt to bring a claim on behalf of its members. In order to establish associational standing, a plaintiff must demonstrate the traditional Article III standing requirements detailed above. In addition to those traditional requirements, a plaintiff invoking associational standing must demonstrate that "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Earth v. Laidlaw Environ. Servs.*, 528 U.S. 167, 180 (2000) (*citing Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

## C. Defendants' Challenges to Plaintiff's Associational Standing

Defendants first argue that Plaintiff lacks associational standing to bring any of its claims. Defendants argue specifically that Plaintiff has not established that the interests served by this lawsuit are germane to Plaintiff's purpose as an organization and that Plaintiff's members are in obvious conflict. Defendants characterize their challenge to Plaintiff's associational standing as a factual challenge. Though the Court is not convinced that Defendants' challenge is indeed a factual standing challenge, as Defendants do not argue that the complaint is "formally sufficient" but still lacking in subject matter jurisdiction, *see Apex Digital Inc.*, 572 F.3d at 444, the Court applies the more stringent standard required under a 12(b)(1) factual challenge. Even under this stricter

standard, Plaintiff has established associational standing to represent its members in the instant lawsuit.

*i. Whether Plaintiff's purpose is germane to this lawsuit*

Defendants first argue that Plaintiff has not established that this lawsuit is germane to Plaintiff's purpose. The requirement that a lawsuit be germane to the representative organization's purpose ensures that "the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996). The germaneness requirement "ensures a modicum of concrete adverseness by reconciling membership concerns and litigation topics by preventing associations from being merely law firms with standing." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 59 (D.C. Cir. 1988). In determining whether a lawsuit is germane to an organization's purpose, the common interest preserved by the lawsuit must be more than "incidental" to the purpose of an organization. *See, e.g., Minn. Fed'n of Teachers v. Randall*, 891 F.2d 1354, 1359 (8th Cir. 1989) (members' interests as taxpayers not germane to organization's specifically stated purpose when the "fact that some or all of its members pay taxes is purely incidental"); *see also Peick v. Pension Ben. Guar. Corp.*, 724 F.2d 1247, 1259 (7th Cir. 1983) (*citing* 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531, at 214 (1975)) ("Associational standing is particularly appropriate when the association is seeking to represent interests which are central to the purpose of the organization.").

Courts most often construe the germaneness prong to require that a litigation's subject matter be pertinent to the organization's stated purpose. *See, e.g., Hodel*, 840 F.2d at 56–58 (finding the germane requirement "undemanding," that it is "highly unlikely" that the germaneness requirement demands centrality of purpose, and noting that most courts require only pertinence to satisfy the requirement); *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (calling the germaneness requirement "undemanding" and a "low threshold"); *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 607 (7th Cir. 1993); *Medical Ass'n of State of Ala. v. Schweiker*, 554 F. Supp. 955, 965 (N.D. Ala 1983) (*aff'd* 714 F.2d 107 (11th Cir. 1983)) (germaneness met when injury to a group's members "has some reasonable connection with the reasons the members joined the organization and with the objectives of the organization"); *Nat'l Lime Ass'n v. E.P.A.*, 233 F.3d 625, 637 (D.C. Cir. 2001) (*quoting Hodel*,

840 F.2d at 58) ("This requirement of germaneness is 'undemanding'; 'mere pertinence between litigation subject and organizational purpose' is sufficient.").

Defendants argue that Plaintiff cannot establish that this lawsuit is germane to its purpose even under an undemanding standard because Plaintiff has failed to provide any information about its purpose at all. In assessing whether a plaintiff has satisfied the germaneness prong, courts often look to an organization's charter or articles of incorporation. *See, e.g.*, *Minn. Fed. of Teachers*, 891 F.2d at 1359; *Hodel*, 840 U.S. at 53. In terms of explaining Plaintiff's purpose, Plaintiff's Complaint notes that "it is the national trade association representing PBMs." Complaint at ¶ 18. However, in its response to Defendants' motion to dismiss, Plaintiff included its certificate of incorporation, which notes that PCMA's purposes include advancing "the common interests of these companies," and "lead[ing], educat[ing], and advocat[ing] on behalf of those companies engaged in pharmaceutical care management." Resistance at Exhibit 1.

The Court therefore must determine whether the instant lawsuit is germane to Plaintiff's purpose of advocating on behalf of its members and advancing their common interests. The interest at stake in this lawsuit is PBMs' ability to keep their MAC information confidential and continue their previously established business operations. Plaintiff argues that MAC information is vital to its member PBMs' competitiveness and success. Plaintiff maintains that the instant lawsuit protects its members' common interests in retaining the value of their MAC lists and continuing existing business practices. Resistance at P. 2. Plaintiff argues that preservation of its members' MAC lists is critical to its members' ability to negotiate payments to contracting pharmacies, and that these business practices and property are the "quintessential interests a trade association" like Plaintiff is designed to protect. Resistance at P. 3.

Here, the Court finds that Plaintiff has presented sufficient evidence in its pleadings and attached affidavits to establish that the instant lawsuit is germane to Plaintiff's purpose. This is a classic example of the purpose of a trade association like Plaintiff. Plaintiff's stated purpose is not merely "incidental" to the purpose of this lawsuit. *Cf. Minn. Federation of Teachers*, 891 F.2d at 1359 (taxpayer interest only incidental to purpose of teachers' association). Plaintiff has sufficiently established that the preservation of its members' business practices is germane to its stated purpose of promoting PBMs and advocating on their behalf.

*ii. Whether conflict between Plaintiff's members defeats associational standing*

Defendants also argue that Plaintiff's members are in conflict and that such conflict defeats Plaintiff's associational standing. When addressing conflicts of interest between members, courts sometimes do so in the context of the germaneness requirement and sometimes do so in the context of determining whether participation of individual members is required. *See Associated Gen. Contractors v. Otter Tail Power*, 611 F.2d 684, 691 (8th Cir. 1979) (addressing germaneness and necessity of individual participation); *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1408 (9th Cir. 1991) (discussing conflict of interest in relation to participation of individual members). Unanimity of membership is not required. *See e.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996) (granting associational standing to intervene when not all members supported intervention). However, obvious conflict between an association's members may defeat standing. *Otter Tail*, 611 F.2d at 691.

Defendants' primary argument is that because PCMA's members regularly compete for business, because each member maintains its own MAC pricing and methodology, and because members have diverse business practices and goals, Plaintiff has not established that it can adequately represent its members. Plaintiff argues that the fact that its members may be business competitors does not mean their interests are adverse for the purpose of this lawsuit, and in fact, argues that because this lawsuit aims to maintain members' abilities to continue present business practices, there is no conflict of interest at all.

The Court does not see any "obvious" possible conflicts of interest or such a vast diversity of interests that Plaintiff fails to meet either the germaneness or the individual participation prong of the associational standing test. The pleadings and attached affidavits establish that Plaintiff's members all rely on MAC methodology and that the lawsuit seeks to preserve Plaintiff's members' ability to utilize that methodology in secret. Furthermore, the attached affidavits establish that Plaintiff's members unanimously approved the instant lawsuit. Resistance at Exhibit 1; *Cf. Otter Tail*, 611 F.2d 684, 691 (8th Cir. 1979) (finding unanimous vote in favor of litigation minimally relevant to germaneness analysis). The fact that members may have adverse interests in certain business transactions outside the scope of the interests asserted in this lawsuit does not mean they have adverse interests for the purpose of this lawsuit. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) ("While [Plaintiff's] members do compete in the marketplace, they uniformly endorsed the present litigation . . . . [T]his case presents no hint that [Plaintiff's]

board authorized this suit without the knowledge or support of any [organization] member or faction."). The Court finds that if any conflict of interest exists between Plaintiff's members by virtue of the fact that they may compete in the marketplace, that conflict is far from "too obvious to make the association an appropriate vehicle to litigate the claims of its members." *Otter Tail*, 611 F.2d at 691. The Court therefore finds that Plaintiff has established all of the necessary elements to invoke associational standing for its claims. Plaintiff has plead specific allegations and supported those allegations with outside information sufficient to establish standing and defeat Defendants' 12(b)(1) factual standing challenge.

### D. Defendants' Challenges to Plaintiff's Standing to bring Takings Clause claims

Defendants argue that even if Plaintiff has associational standing to bring other claims, Plaintiff does not have associational standing to bring its Takings Clause claims, Counts III and IV. Defendants argue that Plaintiff cannot establish Article III standing to bring Takings Clause claims because Plaintiff cannot establish that its members have suffered an injury fairly traceable to the enforcement of HF 2297 and because these claims require the participation of individual group members. Defendants do not characterize this challenge as a factual challenge, nor does the court find that Defendants' argument constitutes a factual challenge to Plaintiff's standing. *Red River Freethinkers*, 679 F.3d at 1022 (review grant of motion to dismiss for lack of standing, which trial court converted into a summary judgment motion, and construing allegations of complaint as true, though requiring specific facts sufficient to demonstrate standing); *Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993) (articulating different standards of review depending on whether trial court had to resolve any issues of disputed fact on a motion to dismiss). The Court therefore applies the standard for facial standing challenges and affords the Plaintiff the regular 12(b)(6) safeguards, including the assumption that the complaint's allegations are true. *Osborn*, 918 F.2d at 729 n.6.

*i. Whether Plaintiff has suffered an injury sufficient to make a takings claim*

Plaintiff challenges HF 2297 under the Takings Clauses of both the Iowa and the United States Constitution. Both Takings Clauses dictate that the government shall not take private property for public use without just compensation. U.S. CONST. AMEND. V; IOWA CONST., ART. I, § 18. Defendants first argue that Plaintiff cannot make out the first Article III requirement: injury. Injury sufficient to establish Article III standing must be "'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not

'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 559 (internal citations omitted). Plaintiff must establish injury "in the same way as any other matter on which the Plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (*quoting Nat'l Wildlife Fed.*, 497 U.S. at 889).

Plaintiff alleges that its members have suffered, and continue to suffer, harm as a result of the passage of HF 2297. Namely, Plaintiff characterizes its members' MAC formulas as trade secrets. Plaintiff argues HF 2297 forces its members to either comply with HF 2297 by surrendering their trade secrets through disclosure of their MAC formulas or abandon their business operations in Iowa. Complaint at ¶¶ 20, 46. Defendants argue that Plaintiff cannot establish a concrete and particularized injury because Plaintiff's members' MAC formulas do not constitute a trade secret.

In determining whether a given piece of information constitutes a trade secret, Federal courts apply state trade secret law. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–04 (1984) (finding trade secret protection a property right defined by state law). Iowa law defines a trade secret as

> [i]nformation, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use. (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

IOWA CODE § 550.2(4). "Iowa courts construe the definition broadly to include business information." *S&W Agency, Inc. v. Foremost Ins. Co.*, 51 F. Supp. 2d 959, 977 (N.D. Iowa 1998) (*citing US W. Commc'ns, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993)). The Iowa Supreme Court explained that information has independent economic value prong when it "protects the owner's competitive edge or advantage," and "would be useful to a competitor and require cost, time and effort to duplicate." *US W. Commc'ns, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993).

Whether Plaintiff's members' MAC methodology is a trade secret is a mixed question of law and fact. *Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 648 (Iowa 1995). At this stage of the proceeding, it is not the Court's role to determine whether Plaintiff's members' MAC methodology is, in fact, a trade secret. The Court looks only at whether Plaintiff has pleaded information sufficient to answer the legal question of whether the MAC methodology could be a trade secret. *Id.* (noting that whether information "could constitute a trade secret under the first part of the definition of trade secret in 550.2(4)" is the legal part of the question). Here, the MAC methodology is clearly "business information." *S&W Agency, Inc.*, 51 F. Supp. 2d at 977. Furthermore, Plaintiff's Complaint notes that "MAC pricing incentivizes the pharmacies to negotiate more competitive rates for prescription drugs," and that "PBMs use MAC lists to balance fairly compensating pharmacies so that they continue to be encouraged to dispense generic products." Complaint at ¶ 31. Plaintiff argues that "[e]ach PBM expends considerable effort and spends significant financial resources developing pricing methodologies for its MAC programs, which are unique to each PBM" and "are not generally known or readily ascertainable in the PBM industry." Complaint at ¶¶ 32–33. Plaintiff provides, by way of example, information regarding some state governments' protection of their own MAC pricing methodologies as proprietary. Complaint at ¶ 33 (*citing* OIG report at P. 12, n.38, *available at* http://oig.hhs.gov/oei/reports/oei-03-11-00640.pdf). Therefore, Plaintiff has pleaded information and provided support for its contention that MAC methodology "could constitute a trade secret." *Econ. Roofing*, 538 N.W.2d at 648.

Notably, Defendants do not question whether this type of information could constitute a trade secret, and instead argue that this specific information is not a trade secret because Plaintiff's members release their MAC methodology to customers or other third parties. Motion at P. 7. In order to preserve a trade secret, the secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." IOWA CODE § 550.2(4)(b). Disclosure of a trade secret in the context of a business arrangement does not necessarily destroy the information's status as a trade secret, so long as the secret does not "fall into the public domain." *Bus. Designs, Inc. v. Midnational Graphics, L.L.C.*, 2002 WL 987971, at *4 (Iowa Ct. App. May 15, 2002) (Hecht, J., dissenting) (*quoting Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991). In some cases, disclosure of information accompanied by a confidentiality agreement may be "reasonable under the circumstances" to protect a trade secret. *Id.* (*citing Elm City Cheese Co.,*

*Inc. v. Federico*, 752 A.2d 1037, 1049 (Conn. 1999)) ("Examples of actions which may be undertaken to maintain secrecy include 1) requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process . . . ."). Here, Plaintiff notes that "in the rare situation where a PBM does provide MAC lists to customers or other third parties, it does so only pursuant to an enforceable confidentiality agreement." Complaint at ¶ 33.

The Court finds that Plaintiff has established that its members generally take reasonable precautions to maintain the secrecy of MAC lists sufficient to establish that this information could constitute a trade secret for standing purposes. At this stage of the litigation, the Court proceeds assuming that Plaintiff's members' MAC methodology constitutes a trade secret, but notes that this conclusion is not determinative of Plaintiff's standing to bring its Takings Clause claims.

*ii. Participation of individual group members*

Defendants argue that, even if the Court finds that Plaintiff's members' MAC pricing methodology constitutes a trade secret, Plaintiff lacks associational standing to bring Takings Clause claims because such claims would require the participation of individual members. Plaintiff can only bring a claim on behalf of its members when "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *see also Warth*, 422 U.S. at 511. Therefore, both the claim asserted and the relief requested are relevant in determining whether a given lawsuit would require the participation of individual group members.

"The inquiry into whether a taking has occurred is essentially an "ad hoc, factual" inquiry. 476 U.S. 986, 1005 (1984) (*quoting Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979)); *see also Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 846–47 (9th Cir. 2001) ("Resolving a Fifth Amendment takings claim requires a fact specific inquiry into what has been taken and what compensation is due."). Therefore, even if the Court can determine that Plaintiff has alleged facts sufficient to establish that Plaintiff's members MAC methodology could constitute a trade secret, determination of whether compelled revelation of the methodology constitutes a taking would require a more intensive factual inquiry. For example, though there is no well-defined test for determining whether a taking has occurred, courts often consider "the economic impact of the regulation on the claimant, the extent to which the regulation has interfered with the distinct investment-backed expectations," and "the character of the governmental action." *Penn Central Transp. Co.*, 438 U.S.

at 124. "[W]hether a taking has occurred depends not only on a legal interpretation of takings jurisprudence, but also on a variety of financial and other information unique" to each member. *Rent Stabalization Ass'n*, 5 F.3d at 597; *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 314 (1st Cir. 2005) ("In this case, putting to one side their generic weakness, individual takings claims could in principle be significantly strengthened or weakened by the particularized circumstances of each individual member."). Though the character of the governmental action may be uniform for each of Plaintiff's members, the first two considerations are highly individualized inquiries. Therefore, participation by Plaintiff's individual members would likely be required to determine whether a taking in fact occurred.

Plaintiff argues that because Plaintiff seeks only declaratory and injunctive relief, individual participation is not required because the Court need not calculate any damages. However, "the *Hunt* test is not satisfied unless 'neither the claim asserted' nor the relief requested requires the participation of individual members in the lawsuit.'" *Rent Stabalization Ass'n*, 5 F.3d at 596 (*quoting Hunt*, 432 U.S. at 343). While it is true that when an association "seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured," the relief sought is not dispositive of the standing issue. *Id.* (*quoting Warth*, 422 U.S. at 515) (internal quotation marks omitted). In short, though the Court may not ultimately need to inquire into the dollar amount of damages due to Plaintiff's request for injunctive relief, the court will still need to inquire into the individual value of each alleged taking in order to determine whether a taking, in fact, occurred. Therefore, participation by Plaintiff's individual members would be required to bring Claims III and IV. Because associational standing would not be appropriate in the context of these Takings Clause claims, Claims III and IV are dismissed pursuant to Rule 12(b)(1).[1]

### III. SUBSTANTIVE ANALYSIS

Defendants also move to dismiss Counts I, II, III, and IV for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). As Plaintiff lacks associational standing to bring Counts III and IV, the Court will not address whether Plaintiff has

---

[1] Defendant makes various other arguments explaining why Counts III and IV should be dismissed. The Court finds these arguments moot and declines to address them because the Court finds Count III nonjusticiable on other grounds.

stated any Takings Clause claims upon which relief may be granted. Furthermore, Defendants do not challenge the sufficiency of Plaintiff's pleadings in relation to Count V, Plaintiff's Dormant Commerce Clause claim. The Court therefore addresses only whether Plaintiff has plead sufficient facts to state a claim as to Count I, Plaintiff's express preemption claim, and Count II, Plaintiff's conflict preemption claim.

**A. Legal Standard for Motion to Dismiss Under 12(b)(6)**

Federal Rule of Civil Procedure 8 requires that a complaint present "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). To survive a 12(b)(6) motion to dismiss, "[a] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Braden*, 558 F.3d at 594 (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570. The claim "may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563. The complaint must "be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting a 'claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (2009) (*quoting Twombly*, 550 U.S. at 570). While not a "probability standard," the "plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Id.*

Furthermore, to adequately state a claim, Plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Stating a claim "requires a complaint with enough factual matter (taken as true) to suggest the required element . . . [and] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (*quoting Twombly*, 550 U.S. at 556) (internal quotation marks omitted). When analyzing the adequacy of a complaint's allegations under Rule 8, the Court must accept as true all of the complaint's factual allegations and view them in the light most favorable to the plaintiff. *See Twombly*, 550 U.S. at 555–56. The evaluation of a complaint upon a motion to dismiss "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678. "All complaints must be read liberally; dismissal on the pleadings never is warranted unless the plaintiff's allegations are doomed to fail

under any available legal theory." *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) (*citing Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005)).

In addressing both Plaintiff's express and conflict preemption claims, the Court cannot assume that "Congress has derogated state regulation," and instead addresses "claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *New York Conference of Blue Cross v. Travelers Ins.*, 514 U.S. 645, 654–55 (1995); *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 613 F.3d 179, 184 (D.C. Cir. 2010). This presumption is particularly important in areas of traditional state regulation such as healthcare. *See Pharm. Care Mgmt. Ass'n*, 613 F.3d at 184.

## B. ERISA Express Preemption

Plaintiff's Count I alleges that ERISA expressly preempts HF 2297. ERISA dictates that its provisions "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." ERISA § 514, *codified at* 29 U.S.C. § 1144. ERISA's express preemption provision preempts any state law that "relates to" an employee benefit plan. A "law 'relate[s] to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990) (*quoting Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983)).

*i. Connection with an Employee Benefits Plan*

In addressing whether a state law has an impermissible "connection with" an employee benefit plan, the Court must guard against "'uncritical literalism' that would make preemption turn on 'infinite connections.'" *Pharm. Care Mgmt. Ass'n*, 613 F.3d at 184 (*quoting Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001)). The Court instead looks to both ERISA's objectives and HF 2297's effects on ERISA plans. *Egelhoff*, 532 U.S. at 147. "One of the principal goals of ERISA is to enable employers to 'establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Id.* at 148 (*quoting Fort Halifax Packing Co v. Coyne*, 482 U.S. 1, 9 (1987)). "Plan administration includes 'determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements.'" *Pharma. Care Mgmt. Ass'n*, 613 F.3d at 185 (*quoting Fort Halifax Packing Co*, 482 U.S. at 9).

14

On March 14, 2014 Iowa Code § 510B.1 was amended as follows:

> *NEW SUBSECTION. 5A. "Maximum reimbursement amount" means the maximum reimbursement amount for a therapeutically and pharmaceutically equivalent multiple-source prescription drug that is listed in the most recent edition of the publication entitled approved drug products with therapeutic equivalence evaluations, published by the United States food and drug administration, otherwise known as the orange book.*

> *Sec. 2. NEW SECTION. 510B.8. Pricing methodology for maximum reimbursement amount.*

> *1.     The commissioner may require a pharmacy benefits manager to submit information to the commissioner related to the pharmacy benefits manager's pricing methodology for maximum reimbursement amount.*

> *2.     For purposes of the disclosure of pricing methodology, maximum reimbursement amounts shall be implemented as follows:*

>> *a. Established for multiple source prescription drugs prescribed after the expiration of any generic exclusivity period.*

>> *b. Established for any prescription drug with at least two or more A-rated therapeutically equivalent, multiple source prescription drugs with a significant cost difference.*

>> *c. Determined using comparable prescription drug prices obtained from multiple nationally recognized comprehensive data sources including wholesalers, prescription drug file vendors, and pharmaceutical manufacturers for prescription drugs that are nationally available and available for purchase locally by multiple pharmacies in the state.*

> *3.     For those prescription drugs to which maximum reimbursement amount pricing applies, a pharmacy benefits manager shall include in a contract with a pharmacy information regarding which of the national compendia is used to obtain pricing data used in the calculation of the maximum reimbursement amount pricing and shall provide a process to allow a pharmacy to comment on, contest, or appeal the maximum reimbursement amount rates or maximum reimbursement amount list. The right to comment on, contest, or appeal the maximum reimbursement amount rates or maximum reimbursement amount list shall be limited in duration and allow for retroactive payment in the event that it is determined that maximum reimbursement amount pricing has been applied incorrectly.*

The first and third paragraphs of Subparts of Section 2 are quite clear. The first Subpart simply states that the Insurance Commissioner may require a PBM to submit information to the

Commissioner relating to its pricing methodology for maximum reimbursement amount. Accordingly, it simply authorizes the Insurance Commissioner to solicit and secure pricing methodology information from PBMs.

Similarly § 2, Subpart 3 is clear. When PBMs use maximum amount pricing, the PBM shall include in its contract with the pharmacy information regarding the source of data used to calculate its MAC pricing. It also requires that the pharmacy be permitted to participate (comment on, contest, or appeal) in the pricing decision.

Section 2, Subpart 2 is so confusingly written that it defies a reasonable interpretation. Subpart 2 begins with the clause, "For purposes of the disclosure of pricing methodology." This would suggest that the requirements that follow relate to the disclosure of information to the Insurance Commissioner described in Subpart 1. However, this clause is then followed by the statement, "Maximum reimbursement amounts shall be implemented as follows." There is no suggestion as to what needs to be "implemented." Subparts 2a and 2b then state that something is to be "established" for certain kinds of prescription drugs. The statute does not say what is established or to be implemented, but does say that it is to be done for the purpose of disclosure of pricing methodology. Finally, Subpart 2c suggests that maximum reimbursement amounts be determined using nationally recognized and readily available data sources. Whatever requirements are imposed by Section 2, several things seem clear. Section 2 relates to certain drugs for which maximum reimbursements are set, the PBM must use nationally recognized and available data in setting MAC pricing, and all this must be done for the purpose of disclosing information concerning pricing methodology to the Insurance Commissioner. The Court finds, for purposes of this motion only, that the law does regulate an area of ERISA concern by regulating PBMs in this manner.

The Court's inquiry does not end with a determination of whether a law regulates an area of ERISA concern. Even if HF 2297 touches on an area of ERISA concern—which the Court is not convinced it does, but assumes as much for purposes of this analysis only—the effect of the law on employee benefit plans must be impermissible. "The precise point at which a state law so constrains an ERISA plan's choices as to undermine the goal of uniformity in plan administration is uncertain." *Pharma. Care Mgmt. Ass'n*, 613 F.3d at 179 (*citing Shaw*, 463 U.S. at 100 n.21) ("Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan."). Courts have found that "ERISA

pre-empt[s] state laws that mandate[] employee benefit structures or their administration." *Travelers*, 514 U.S. at 657 (reviewing several cases). However, when a law asserts only an "indirect economic influence" that "does not bind administrators to any particular choice," the law does not act "as a regulation of an ERISA plan itself," and is not preempted. *Id.* at 660.

While HF 2297 is drafted such that determining what it affirmatively requires is nearly impossible, the Court is able to determine what the statute cannot be interpreted to require. HF 2297 does not require a particular price for any drug. It does not set a pricing methodology for any drug. It does not dictate that a PBM use any one particular source of data when calculating and disclosing its pricing methodology, and it does not unduly restrict the administration of any ERISA plan.[2] It simply requires disclosure of pricing methodology to the Insurance Commissioner upon request and regulates the relationship of a PBM to a pharmacy to the extent that the PBM must identify its data source and permit the pharmacy to contest maximum reimbursement amount decisions. Because HF 2297 does not mandate the provision of any benefits and still leaves PBMs with sufficient choice and control, HF 2297 does not have an impermissible connection with ERISA.[3] Because the Court finds that HF 2297 does not have an impermissible connection with ERISA, the Court now addresses whether ERISA expressly preempts HF 2297 due to an impermissible reference to ERISA.

*ii. Reference to an Employee Benefits Plan*

A law makes reference to an ERISA plan "[w]here [it] acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation." *Pharma. Care Mgmt. Ass'n*, 613 F.3d at 189 (*quoting Cal. Division of Labor Standards Enforcement v. Dillingham*, 519 U.S. 314, 325 (1997). Plaintiff argues that because Iowa Code Chapter 510B references ERISA in its definition of "covered entity," the definition of PBM references "covered entity," and because this law regulates PBMs, the law explicitly references ERISA and is therefore preempted. Plaintiff relies on *Prudential Insurance Co. v. Nat'l Park Medical Center, Inc.*, and *District of Columbia v. Greater Washington Board of Trade* for the

---

[2] Plaintiff appears to agree that while HF 2297 may restrict the data PBM's use to calculate MAC pricing to a certain group of data, it does not dictate the precise data used. This is evidenced by Plaintiff's characterization that Iowa's law requires "that PBMs include in a contract with retail pharmacies information regarding *which* 'national compendia' they use to obtain pricing data." Complaint P. 4 (emphasis added).

[3] Even if these requirements impose a heightened cost on PBMs, the court finds that the statute asserts at best an "indirect economic influence" that "does not bind plan administrators to any particular choice." *Travelers*, 514 U.S. at 660.

proposition that when a law "attempts to exclude from coverage of the [law] at least some ERISA plans…and singles out ERISA employee benefit plans for different treatment under state [law]," the law may be preempted on basis of the reference to ERISA alone. Resistance at P. 10–11. Plaintiff is correct that these cases, and others, have found state laws preempted due to explicit reference to ERISA in the state regulations. *District of Columbia v. Greater Wash. Bd. Of Trade*, 506 U.S. 125, 130 (1992); *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 829–30 (1988).

The instant case is notably distinguishable from *Greater Washington Board of Trade, Mackey v. Lanier Collection Agency*, and *Pharmaceutical Care Management Association v. District of Columbia*. In each of these cases, the express reference to ERISA was contained in the language of the challenged provision itself. In *Mackey*, Plaintiff challenged a provision of a Georgia statute "barring the garnishment of '[f]unds or benefits of an . . . employee benefit plan or program subject to . . . ERISA.'" *Mackey*, 486 U.S. at 30. The Court struck the Georgia Code section that specifically referred to ERISA. *Id.* In *Greater Washington Board of Trade*, a state law made implicit reference to ERISA when it mandated that employers provide health insurance coverage "equivalent to the existing health insurance coverage of the employee." *District of Columbia v. Greater Wash. Bd. Of Trade*, 506 U.S. at 128. As in *Mackey*, the Court in *Greater Washington Board of Trade* struck the provision of the law that made the implicit reference to ERISA. *Id.* at 129–30. Finally, in *Pharmaceutical Care Management Association v. District of Columbia*, the Court meticulously analyzed various portions of the statute in question, striking some as preempted and allowing others to stand. *See generally Pharma. Care Mgmt. Ass'n*, 613 F.3d 179. The Court engaged in a section-specific analysis, striking particular sections under various justifications for preemption. *Id.*

Here, the Iowa statute references ERISA in the definitional portion of the statute not contained in HF 2297. Section 510B.1.2's definition of "covered entity" includes a specific reference to ERISA, explicitly excluding ERISA plans from the definition of "covered entity." Section 510B.1.8 defines "Pharmacy Benefits Manager" as a person who performs pharmacy benefits management services for covered entities. Plaintiff notes that HF 2297 includes Iowa Code sections 510B.1(5)(a) and 510B.8, and seeks declaratory relief that HF 2297 is preempted by ERISA. Contrary to Plaintiff's claims, HF 2297 does not "specifically refer" to ERISA plans. Resistance at P. 11. HF 2297 does not even include the words "covered entity"—the phrase defined

in 510B.1.2 by reference to ERISA plans. HF 2297 contains only reference to "Pharmacy Benefits Managers." Plaintiff argues that because ERISA is referenced by name in § 510B.1.2, the Court should strike § 510B.1(5)(a) and § 510B.8—separate sections of the statute that are twice removed from the specific reference. Plaintiff has presented no authority dictating that a Court should strike a statutory section as preempted because a separate provision of the same statute makes an express reference to ERISA. Furthermore, HF 2297 does not "act[] immediately and exclusively upon ERISA plans" and "the existence of ERISA plans" is not "essential to the law's operation." *Pharma. Care Mgmt. Ass'n*, 613 F.3d at 189 (*quoting Cal. Division of Labor Standards Enforcement v. Dillingham*, 519 U.S. 314, 325 (1997). Therefore, the Court finds that HF 2297 does not contain an impermissible "reference to" ERISA. Because HF 2297 is not impermissibly "connected to" and does not contain an impermissible "reference to" ERISA plans, HF 2297 is not preempted under ERISA's express preemption clause.

## C. ERISA Conflict Preemption

Plaintiff also contends that HF 2297 should be declared preempted under conflict preemption principles because its provisions are in direct conflict with ERISA and therefore thwart ERISA's purposes and objectives. A state law may be preempted when it "conflicts with a specific portion of the complex ERISA statute. If there is a conflict, the state law is preempted, whether or not "the statutory phrase 'relate to' provides further additional support for the pre-emption claim." *Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 439 (8th Cir. 1997) (*quoting Boggs v. Boggs*, 520 U.S. 833, 841 (1997)). "Conventional conflict pre-emption principals require pre-emption 'where compliance with both federal and state regulations is a physical impossibility, . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Boggs*, 520 U.S. at 844 (*quoting Gade v. National Solid Wastes Mgmt. Ass'n.*, 505 U.S. 88, 98 (1992)).

However, Plaintiff falls short of citing any "specific portion" of ERISA in support of its assertion that HF 2297 is preempted. Plaintiff alleges that HF 2297 directly conflicts with ERISA by "imposing disclosure and reporting requirements in addition to and in conflict with the uniform set of rules set for in ERISA," and provides as support a citation to 29 U.S.C. §§ 1021–30. Plaintiff, instead of citing a "specific portion" of the statute, cites the entirety of ERISA's reporting and disclosure regulations. Plaintiff argues that HF 2297's conflict with any number of the regulations set out in the above ERISA sections "thwarts the purposes and objectives of Congress" and is

therefore preempted. Complaint at ¶ 11. To adequately state a claim, Plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While Plaintiff repeatedly alleges that a conflict exists, Plaintiff provides virtually no information as to how such a conflict exists. For that reason, the Court hesitates to find that Plaintiff has met *Twombly*'s pleading requirements.

However, assuming that Plaintiff has supplied enough information to adequately state a claim for conflict preemption, the Court finds that ERISA does not, in fact, preempt HF 2297 as a matter of conflict preemption. The main inquiry here is whether, as Plaintiff alleges, HF 2297 directly conflicts with ERISA. The Court reiterates the difficultly of determining the precise effects of HF 2297, but restates its earlier conclusion that HF 2297 allows disclosure of pricing methodology to the Insurance Commissioner upon request and regulates the relationship of a PBM to a pharmacy to the extent that the PBM must identify its data source and permit the pharmacy to contest maximum reimbursement amount decisions. HF 9927 does not mandate any benefits or any certain price for a given drug.

HF 2297 is not preempted based on a "conflict with a specific portion of" ERISA. ERISA provides enforcement mechanisms for plan holders and beneficiaries denied benefits and seeking relief. United States Code §§ 1021–30 are extensive and detail various pieces of information a third-party administrator must provide to participants and beneficiaries. The Plaintiff does not specify any provisions relating to disclosure requirements by PBMs to pharmacies. Plaintiff is correct that HF 2297 establishes additional disclosure requirements with relationship to pharmacies. However, the Court finds that these additional disclosure requirements do not make it "impossible" to comply with both State and Federal law or thwart Congress's purpose of establishing uniform national law relating to ERISA plans. *See Boggs*, 520 U.S. at 844 (citations omitted). Furthermore, the Court finds that the appeals process contemplated by HF 2297 is wholly separate from the ERISA provision cited by Plaintiff, which details the appeals process to be followed in the case of a plan participant or beneficiary being denied ERISA benefits—not pharmacies in contract negotiations with PBMs. 29 C.F.R. §2560.503-1. The Court agrees with the State that these HF 2297 provisions complement, not frustrate, ERISA's purpose. ERISA's mere inclusion of disclosure requirements does not mean that ERISA preempts all state laws that impose any disclosure requirements upon PBMs. It only preempts those state laws that conflict

with a specific portion of the Statute or frustrate ERISA's purpose. HF 2297 does neither and is therefore not preempted.[4]

### IV. CONCLUSION

Plaintiff PCMA has associational standing to bring claims on behalf of its member PBMs in most contexts. However, Plaintiff does not have standing to bring a Takings Clause claim under either the Federal or Iowa Constitution because such claims require the participation of individual members. The Court finds that ERISA does not preempt HF 2297 as a matter of law, and therefore dismisses Plaintiff's claims of both express and conflict preemption. The State has not challenged Plaintiff's Dormant Commerce Clause claim at this stage of litigation, and because the Court finds that Plaintiff has standing to bring such a claim, Plaintiff's Dormant Commerce Clause claim survives the instant motion to dismiss.

Upon the foregoing,

**IT IS ORDERED** that Defendants' motion to dismiss is **GRANTED** with respect to Counts I, II, III, and IV and **DENIED** with respect to Count V. The Clerk shall enter judgment accordingly.

**DATED** this 18th day of February, 2015.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA

---

[4] Because the Court finds that HF 2297 is not preempted by ERISA, the Court does not address the parties' arguments regarding whether HF 2297 would be saved by ERISA's "savings clause."